THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GOOD WILL HUNTING CLUB, INC.** | : | |
| | : | |
| **Plaintiff** | : | |
| **v.** | : | **4:11-CV-1152** |
| | : | **(JUDGE MARIANI)** |
| **RANGE RESOURCES-APPALACHIA,** | : | |
| **LLC** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

### I. Introduction

Trial commenced in the above-captioned case on September 10, 2012 and concluded on September 12, 2012. For the reasons set forth below, the Court awards judgment in favor of Defendant.

### II. Statement of Facts ("SOF")

#### A. Joint Statement of Undisputed Facts

1. In early 2006, Loren Bly ("Bly"), an attorney, and Robert Beyer ("Beyer"), a Certified Public Accountant, formed Appalachian Oil and Gas Advisors, LLC ("AOGA") to provide services to landowners seeking to enter into oil and gas leases.

2. In February 2006, Good Will Hunting Club, Inc. ("Good Will") engaged AOGA to negotiate and secure an oil and gas lease.

3. On or about February 12, 2006, Good Will executed a fee agreement with AOGA.

4. Good Will designated its member, Philip DePasqua ("DePasqua") to be the contact person between Good Will and AOGA regarding lease negotiations.

5. In or about late spring 2006, Bly, of AOGA, approached Great Lakes Energy Partners, LLC ("Great Lakes"), a wholly owned subsidiary of Range Resources Corporation, concerning the possibility of entering into oil and gas leases with several property owners in Lycoming County, Pennsylvania, including the property owned by Good Will.

6. AOGA entered into negotiations with Great Lakes in order to obtain an oil and gas lease for Good Will.

7. Between 2004 and 2005, Bly negotiated the terms of oil and gas leases with Great Lakes concerning Larry's Creek Fish and Game Club, LLC ("Larry's Creek") and other properties in Lycoming County, Pennsylvania.

8. No agreements were reached between Bly and Great Lakes concerning any of these properties; however, AOGA utilized the negotiations on those leases as a starting point for negotiation with Great Lakes on behalf of Good Will and other landowners in the late spring of 2006.

9. AOGA primarily communicated with Brad Benjamin ("Benjamin"), a landman for Great Lakes.

10. Benjamin's immediate supervisor was Mark Acree ("Acree"), the Vice-President of Land at Great Lakes.

11. No individual at Good Will communicated directly with Great Lakes regarding the negotiations of the Lease.

12. On May 15, 2006, Bly contacted Good Will stating AOGA had received written confirmation of Great Lakes' acceptance of the lease.

13. On May 30, 2006, Beyer, representing AOGA, presented a final draft of the lease to Good Will for its consideration.

14. Great Lakes and Goodwill entered into an Oil and Gas Lease (the "Lease") dated June 6, 2006 with a five year primary term.

15. The Lease was signed on behalf of Great Lakes by Acree.

16. The Lease was signed on behalf of Good Will by the President of Good Will, Russell Williamson ("Williamson"), and the Secretary/Treasurer of Good Will, Clifford Hinkleman ("Hinkleman").

17. The Lease was signed on behalf of AOGA by Loren L. Bly.

18. In 2007, Great Lakes changed its name to Range Resources-Appalachia, LLC ("Range").

19. After 2008, Range closed the former Great Lakes office in Hartsville, Ohio and moved its corporate operations for Pennsylvania Marcellus Shale leases, including Good Will's Lease, to Range's office in Southpointe, PA.

20. In June 2010, Range staked a drill site for the Goodwill 5H Well (the "Well").

21. In July 2010, Range obtained a right-of-way and easement over a neighboring property, which provided Range additional access to the drill site for the well, and paid the neighbor for such access.

22. On or about July 22, 2010, Range submitted a Notice of Intent for Coverage Under the Erosion and Sediment Control General Permit ("ESCGP-I") to the Pennsylvania Department of Environmental Protection ("DEP").

23. On August 18, 2010, Range completed the filing process for the ESCGP-1 Permit.

24. Range engaged a subcontractor to design a grading and erosion control plan for the Well pad site. The subcontractor prepared the Erosion and Sedimentation Control Plan and Site Restoration Plan Narrative on July 6, 2010, and revised it on August 6, 2010.

25. Range's landman, Jason Sepanski, submitted a Well Site Agreement, Timber Damage Release Agreement, and Damage Release Agreement to Good Will in late July 2010.

26. On August 27, 2010, Range received an Approval of Coverage under its ESCGP-1 Permit from the DEP related to the Good Will well site.

27. On or about September 2, 2010, Range and Good Will entered into a well location agreement in which Good Will approved well sites, associated

production equipment, access roads, and a proposed pipeline for Goodwill Wells 4H, 5H, 6H, 7H, 8H, and 9H.

28. On or about September 2, 2010, Range and Good Will entered into a Damage Release Agreement. Pursuant to this Agreement, Range paid $5,000.00 to Good Will, which was accepted by Good Will.

29. On September 2, 2010, Range and Good Will entered into a Timber Damage Release Agreement. Pursuant to this Agreement, Range paid $4,500.00 to Good Will, which Good Will accepted.

30. Range moved the administration of the North-Central Pennsylvania Marcellus Shale leases, including the Lease, from its office in Southpointe, Pennsylvania to Fort Worth, Texas.

31. Once administration of the Lease was transferred to Fort Worth, Linda Slone ("Slone") and others were in charge of the geographical location where the Good Will property is located.

32. Linda Slone's immediate supervisor currently is, and was at the time, Carl Steinle ("Steinle").

33. On October 6, 2010, Range submitted an application for well permit for the Goodwill 5H Well (the "Well") to DEP. In connection with the permit application, Range paid the permit fee.

34. On October 25, 2010, Range filed a Zoning/Development Permit application with the Lewis Township (the "Township") for the well.

35. On October 27, 2010, Range paid a zoning permit application fee to Lycoming County for a number of wells, including the Well.

36. On November 8, 2010, Range's Zoning/Development permit was approved.

37. On November 16, 2010, Range paid the Township for the Zoning/Development Permit Application fee.

38. On November 17, 2010, the DEP issued the Well Permit to Range for the Well.

39. On November 19, 2010, Range obtained an Approval under Rule 18 CFR §806.22(f) for Consumptive Water Use Related to Natural Gas Well Development from the Susquehanna River Basin Commission, relating to the Well pad site.

40. On December 16, 2010, Good Will conveyed 91% of its interest in the oil, gas and mineral rights to G.W. Gas, Inc. (Good Will and G.W. Gas, Inc. are hereinafter collectively referred to as "Good Will").

41. On February 2, 2011, Range submitted an original well permit application package to DEP for the Goodwill 6H well. On February 23, 2011, Range paid the Commonwealth of Pennsylvania for the drilling permit application fee for the 6H well.

42. On April 4, 2011, Range obtained a Road Bonding permit from the Township.

43. On April 8, 2011, Range obtained the DEP permit to drill the Goodwill 6H well.

6

44. On April 19, 2011, Range obtained a Road Right of Way and Easement from a neighboring property owner for the purpose of constructing, maintaining, widening, improving and using a road, for which Range paid a negotiated fee.

45. On May 11-12, 2011, Range re-staked the Well site in preparation for construction of the pad.

46. On May 17, 2011, Range entered into a Road Right of Way and Easement and Temporary Workspace agreement with a neighboring property for the purposes of constructing, maintaining, widening, improving, and using a road and paid a negotiated fee for that agreement.

47. On May 18, 2011, Range executed a Designation of Unit, including the Good Will property.

48. This unit provided Good Will the minimum 25% interest required under the Lease.

49. On or about May 25, 2011, Range submitted an Application For An Onlot Sewage Disposal System Permit, which is administered by the Township on behalf of the DEP, relating to the Well pad site and paid the application fee.

50. On May 25, 2011, Good Will's attorney sent a letter to Range asserting that the Lease would expire at the end of primary term in the absence of production in paying quantities.

7

51. On May 26, 2011, Carl Steinle responded to Good Will's May 25 letter by stating that the Lease could be extended by commencing a well before the end of the primary term and that Range had already conducted numerous activities constituting commencement of a well.

52. On May 26, 2011, Range received a Temporary Permit for the Installation of a Sewage Disposal System from the Township.

53. On May 28, 2011, Range began clearing timber in preparation for construction of road access to the Well site.

54. Beginning on or about May 28, 2011, Range and its contractors constructed roads for access to the Well site.

55. On June 2, 2011, a Water Supply Survey Report was prepared for Range by a subcontractor.

56. Beginning on or about June 5, 2011, Range constructed the pad site for the Well.

57. Prior to June 6, 2011, Range incurred significant costs including applying for, and obtaining, necessary permits, removing timber, and obtaining and constructing road access.

58. As of June 6, 2011, no paying quantities had been produced from the property.

59. As of June 6, 2011, the First Well was not producing in paying quantities and had not been completed.

60. On June 10, 2011, Good Will filed this lawsuit in the Court of Common Pleas of Lycoming County, Pennsylvania seeking a declaration that the Lease had expired by its own terms.

61. On June 11, 2011, Range staked the location of the "cellar".

62. On June 17, 2011, Range removed the lawsuit filed by Good Will to the United States District Court for the Middle District of Pennsylvania, citing diversity of citizenship of the Parties as the jurisdictional basis.

63. On June 19, 2011, Range's contractor constructed a cellar on the pad site for the Well.

64. Between June 6, 2011, and June 23, 2011, Range incurred significant costs relating to its activities, including road construction, entering into access agreements, preparing the site for the arrival of the drilling rig, and constructing the pad site.

65. On June 23, 2011, Range's contractors moved a conductor rig onto the pad site over the cellar.

66. On June 23, 2011, the conductor rig drilled a twenty inch conductor hole to a depth of 20 feet, and 20 feet of conductor pipe was installed in the hole and cemented in place.

67. On August 4, 2011, Range's contractors moved an air rig called the "Falcon Rig #1" onto the property and assembled it.

9

68. From August 5 - August 11, 2011, the Falcon Rig #1 drilled a portion of the well bore.

69. On or about August 9, 2011, the surface casing was installed and cemented in to a depth of 627 feet.

70. On or about August 11, 2011, the intermediate casing was installed and cemented in to a depth of approximately 1,830 feet.

71. On or about August 26, 2011, Range's contractors moved the Union 124 horizontal drilling rig to the well site.

72. The Union 124 horizontal drilling rig operated 011 the Good Will property from August 26 - October 9, 2011.

73. The Union 124 horizontal drilling rig completed vertical drilling on September 15, 2011, reaching a total depth of 8,200 feet.

74. Range finished logging activities and began drilling the curve that turns the hole from a vertical direction to a horizontal direction on or about September 15, 2011.

75. On or about September 15, 2011, Range's contractors began drilling the horizontal portion of the Well.

76. By September 21, 2011, Range completed the horizontal well bore, reaching a total depth of 11,472 feet.

77. Thereafter, the drilling assembly became stuck in the well bore.

78. Range could not remove this assembly despite multiple attempts.

79. As a result of the obstructed well bore, Range made the decision to drill a new lateral 100 feet from the obstructed well bore.

80. The new lateral well bore was completed at a total depth of 11,516 feet on October 5, 2011.

81. From October 6 - October 8, 2011, the drilling pipe was removed, and the production casing was installed and cemented into place.

82. Range began hydraulic fracturing operations on the Well on February 14, 2012.

83. Hydraulic fracturing operations were completed by March 4, 2012.

84. Range conducted flow back testing of the Well between April 9 and April 12, 2012.

85. Between June 23, 2011 and April 13, 2012, Range incurred significant costs to drill and complete the Well

86. In September 2011, at the request of the Parties, this Court entertained Cross Motions for Summary Judgment.

87. In its Memorandum and Order denying the parties cross motions for Summary Judgment, the court stated that it was ". . . eager to hear any evidence of contract deliberations and negotiations and what each of the parties understanding of its rights and obligations under the Lease."

## B. Court's Further Finding of Facts

88. Bly had over thirty years of experience in oil and gas law beginning in 1972 when he

    "did a large amount of oil and gas law in Jamestown, working with the development

    of shallow oil wells in northwestern Pennsylvania or Medina gas wells in western

    New York. And [he] continued to do that up to the present time." (Bly Dep. I at

    12:3-10).

89. In connection with these gas wells, Bly performed leasing work on behalf of both

    landowners and operators. (*Id.* at 12:11-13:17).

90. Bly pointed out the lack of legal expertise of other "consultants" in the area to Good

    Will. (Tr. Ex. 12).

91. Article 1.1 of the Lease says the Lease:

    shall remain in force for an initial term of five (5) years from the date above
    stated (hereinafter designated "Primary Term"), and shall continue from year
    to year thereafter for so long as oil and/or gas or other liquid hydrocarbons
    are produced in Paying Quantities[1] from the Leased Premises or after the
    development of the First Well in accord with the provisions of Article 8 below,
    the Lessee is engaged pursuant to Article 9 of this Agreement in a bona fide
    attempt to secure or restore the production of oil and/or gas or other liquid
    hydrocarbons by conducting additional drilling operations on the Leased
    Premises, or Lessee is engaged in the plugging of wells or the removal of
    equipment there from [*sic*] pursuant to the Provisions of Article 19 of this
    Agreement.

    (Tr. Ex. 1).

---

[1] "'Paying Quantities' shall be defined as the sale of a sufficient quantity of crude oil and/or natural gas produced from wells developed under the earned acreage of the leased premises to generate gross revenues greater than 150% of the well(s) [*sic*] actual cost to produce."

92. Section 8.1 is entitled FIRST WELL, and it provides: "[u]nless sooner terminated as otherwise herein provided, Lessee shall commence a well on the Leased Premises . . . within five (5) years from [June 6, 2006] and shall drill said well with due diligence." It goes on to say that "[i]n the event the aforesaid well is not commenced within such five (5)-year period, this Agreement shall be automatically terminated in its entirety." (*Id.*).

93. A "leasing agent" is "a person who has particular understanding of the oil and gas industry who is experienced in the development of leases for the marketing of acreage or blocks of acreage." (Bly Dep. II, at 15:6-11).

94. Hinkleman, one of two Good Will signatories to the Lease, and other members of the club placed their reliance on Bly to negotiate the lease. (Doc. 58, Tr. Trans. at 180:15-21).

95. The first time Williamson, the other Good Will signatory to the Lease, spoke with anyone about any specific terms of the Lease was sometime in 2010, and such discussion was with DePasqua. (Doc. 58, Tr. Trans. at 81:6-83:25).

96. "January 2010 is the first time" that DePasqua, Vice-President of Good Will, had "any specific recollection of extension of the lease." (Doc. 59, Tr. Trans. at 73:3-10).

97. DePasqua had no conversations with Great Lakes before executing the Lease. (*Id.* at 73:3-6).

98. At Good Will's internal meeting to discuss whether or not to sign the Lease, Williamson testified he "[did] not believe there was" a discussion regarding how the Lease might be extended. (Doc. 58, Tr. Trans. at 54:25-55:2).

99. Williamson also never had conversations with anyone from AOGA or Great Lakes "regarding the length of the lease." (Id. at 79:16-19, 72:7-12).

100. Hinkleman also had "actually no" memory of "any specific discussions that happened at the meeting" and had no understanding of Article 1.1 at the time he signed the Lease. (Id. at 167:20-23, 170:3-10).

101. No one from Good Will asked Bly what "commence a well" meant or how Articles 1 and 8.1 fit together at the time the Lease was drafted and negotiated. (Bly Dep. I, at 42:24-43:5).

102. Bly did not recall discussing any specific provisions of the Lease with Good Will representatives "other than the final sit down before signing the lease. And we generally looked at, went through the lease and I kind of said or asked are there any questions. And I believe it was no, let's sign, let's proceed." (Bly Dep. II, at 62:10-16; see also 72:3-73:5, 74:2-75:11).

103. "The primary template and the one that was used with the Good Will property was negotiated with Range Resources' predecessor, Great Lakes Energy Partners, LLC, in 2004/2005 period," before Bly formed AOGA with Beyer. (Bly Dep. I, at 14:24-15:9).

104. At the earlier negotiations, Bly "represented four primary landowners that owned 12,000 acres" and "acted as leasing agent for the four landowners and negotiated the terms of that lease." (*Id.* at 15:10-18).

105. Those four landowners were "Larry's Creek Fish and Game Club, Inc., Elbow Fish and Game Club, Inc., Christian W. Landis, and his wife, Nancy Landis, and Richard and Cathy Yingst." (*Id.* at 15:23-16:2).

106. After developing this template, he "submitted it to . . . Brad Benjamin and Mark Acree in a joint meeting in Brad's or the little conference room off of Brad's office in Hartville" in "mid '04." (*Id.* at 20:24-21:6).

107. Brad Benjamin "did have meetings and conversations with primarily Loren Bly." (Benjamin Dep. at 32:2-10).

108. Though Great Lakes had its own standard lease agreement, Benjamin recalled that Bly "had a specific lease for that he wanted to use that . . . he developed. And it was totally different than the lease form that we customarily used." (*Id.* at 38:16-39:6).

109. Bly's proposed lease was significantly longer than the standard Great Lakes lease and "Bly, as a consultant for his clients, put a lot of additional information and specific provisions and terms within his lease agreement." (*Id.* at 41:18-42:3; 45:1-7).

110. Though Benjamin could not recall specific details about the negotiations with Bly, he was firm in his recollection that Bly "brought the form to us and apparently was working to get the best deal he could for his clients, and this was the form that he wanted to use and insisted upon using." (*Id.* at 47:12-17).

111. Mark Acree, Benjamin's supervisor, recalled that "Mr. Bly presented a lease form that he had been working on, either with himself or his partner or other people. And that's where we got into that." (Acree Dep. at 24:3-7).

112. Between the form template and the Good Will-Great Lakes Lease, the only changes Bly specifically remembered making to the template were the bonus provisions and the property description. (Bly Dep. I, at 34:25-35:6).

113. Bly did not recall any other changes he may have made to the Good Will lease. (*Id.* at 35:10-22).

114. "The issue of concern to these landowners was minimizing surface disturbance to their timber lots, to their woodlands, to their meadows, to their plantings for feed for livestock." (*Id.* at 23:9-21).

115. What was important to Good Will was protective language for hunting and surface rights. (Ex. 25, May 30, 2006 e-mail from Beyer to DePasqua).

116. Bly further stated:

> One specific item that I remember was that if you look at . . . the 8.1 paragraph where it says shall commence a well and shall drill the well with due diligence, . . . I know that I specifically asked that that phrase be changed to drill and complete a well with due diligence. And Brad told me

that they could not do that and I said why? And he said, because, as you know, after a well is drilled, it is logged. And many times when we don't know a formation or we don't know where you're developing, we have to make a decision not to complete the well. And it made perfect sense to me. So I dropped the requirement of completion of the well as the due diligence of drilling the well.

(Bly Dep. I, at 25:1-21).

117. He also said that

Article 1, I remember a specific meeting and discussion of the interrelationship of Article 1 and Article 8.1, in that I told them that I was wanting to avoid ambiguity in the drafting of that lease. Because the standard oil and gas lease up until that time very often was open ended for the lessee to either to continue the search for oil and gas after the expiration date of the addendum clause or to have to receive notice from the lessor that the lessor deemed the lease to be terminated because the term had passed. And we went to some great length to be very clear that we had solid language in that regard.

(Id. at 24:4-21).

118. This form template was what Bly used in his negotiations for Good Will Hunting, as well. (Bly Dep. II, at 55:17-24, 57:16-23, 145:8-15).

119. Bly contacted Benjamin to discuss potential negotiations between Great Lakes and Good Will in either April or May 2006. (Bly Dep. I, at 32:1-25, 34:10-18).

120. Bly usually drafted a provision and sent it to Brad for review and approval. "One thing in the negotiation process that [Bly] had learned . . . was that if you can be the author of a text you usually have an advantage by drafting it the way you want it, and [Bly] was pleased to proceed that way." (Bly Dep. II, at 45:18-46:7).

121. Based on his previous negotiations with Great Lakes and experience, Bly
     confirmed that Articles 1.1 and 8.1 must be read together and harmonized to
     eliminate ambiguity. (Bly Dep. I, at 36:4-14).

122. Bly admitted that commencement of a well would be sufficient to extend the lease
     beyond the primary five-year term. (Bly Dep. I, at 37:19-38:7).

123. Bly agreed that "commencing a well" included more activities than having an
     actual drill bit in the ground. (*Id*. at 39:6-12).

124. Bly agreed that the term was an industry term of art. (Bly Dep. II, at 147:8-16).

125. At his deposition, Bly opined that Range's activities had amounted to
     "commencement of a well."

     Based upon my knowledge of the development of oil and gas wells and
     the new modification of the development of oil and gas wells that occurred
     by reason of horizontal drilling and hydrofracking, I am very sure that the
     activities of Range before the termination of the lease constituted the
     commencement of a well.

     (Bly Dep. I, at 71:6-14).

126. Bly sent an e-mail to DePasqua on September 27, 2010 stating "Rob and I still
     believe that [Range has] realized the need to renegotiate or extend or modify the
     current lease due to the probable inability to have actual delivered production by
     the end of the fifth year. They may attempt to do so through a leasing
     subsidiary." (Ex. 74).

18

127. In response to the question, "as of September 27, 2010 did you believe that Range had to renegotiate or extend due to the probable inability to have actual delivered production by the end of the fifth year?" Bly responded, "[y]es." (Bly Dep. II, at 96:6-12).

128. Bly testified he believed the same as of November 15, 2010 when he told DePasqua "Phil, you've got an HPB lease. It's got to be held by production." (Id. at 105:6-19, 112:16-21).

129. Later, Bly testified that "I believe that I did refer to it as a paying quantities lease. (Bly Dep. I, at 54:16-17; see also Ex. 74).

130. As of September 27, 2010, Bly "hadn't revisited the subject matter provisions of these termination or exploration at this point in time," so at the time, he believed Range had to be in actual production to hold the Lease. (Bly Dep. II, at 96:18-97:3).

131. When DePasqua asked in November 2010 about how the Lease could be extended, Bly stated

this may have been the trigger that caused me to undertake that review, because I had been pressed by [another client] also for a similar answer to the questions of what would hold the lease or what would constitute the commencement of a well. And I believe he used the phrase commencement of a well. And that, you know, brought me back to the lease. And clearly it was there, that was a standard by which development could occur.

(Id. at 153:25-154:14).

19

132. Bly elaborated, "I understood that to be a provision of the lease, and that I believed it then to be the target as per my discussions with Mr. Steinle of their standard of performance to proceed with what he assured me was a steadfast commitment not to let leases expire." (*Id*. at 156:14-21).

133. Bly explained his reference to the Lease as a paying quantities lease by saying "[t]he clear provisions of Article 1.1 are a paying quantities normal provision to hold the lease. It is extended and modified to the extent that Article 8.1 is incorporated as a specific exception for commencement." (Bly Dep. I, at 54:16-23).

134. When Bly told DePasqua it was a HBP lease, "[he] was wrong." (Bly Dep. II, at 162:16-18).

135. In December 2010, AOGA sent a letter to its clients who had leases with Range saying: "we now realize that Range MAY CHOOSE TO commence a well by the end of the stated term and rely upon their ability to hold your lease by their subsequent diligent development of the same." (Ex. 86).

136. Bly explained, "Yes, because it truly was an a-ha moment as we talked with Carl, and as I had concluded about the same time research on Pennsylvania law which led me to see, review, and understand the *Pemco*[2] case." (Bly Dep. II, at 109:3-11).

---

[2] *Pemco Gas, Inc. v. Bernardi*, 5 Pa. D. & C. 3d 85 (Pa. Com. Pl. Ct. 1977).

137. DePasqua forwarded the letter to Williamson, saying "I am less than pleased with the interpretation, but agree that it is probably correct." (Ex. 85).

138. As early as January 8, 2010, eleven months before AOGA sent its letter, DePasqua wrote to Beyer, "Thanks, Rob. Good catch on the '. . . or commenc[ing] a well . . .' in addition to the paying quantities provision, which I did not recall. I guess the follow-up question will be, what constitutes commencing." (Ex. 59; *see also* Doc. 58, Tr. Trans. at 154:13-21).

139. DePasqua sent an e-mail to Beyer on April 15, 2011, attaching a copy of the *Pemco* case. Beyer's response to DePasqua was, "[v]ery interesting and a little disturbing. I agree with you that it appears as though there's a broad interpretation of commencement of drilling." (Ex. 128).

140. Beyer wrote back to DePasqua on April 18, 2011 saying "Ranger [*sic*] Resources will most likely prevail in holding your lease unless you are proactive in efforts to delay them." (Ex. 131).

141. Beyer then wrote to John Reynolds saying "[m]ore importantly is the language contained in your current Lease Agreement regarding Ranges ability to hold your Lease, and how that language would be LEGALLY INTERPRETED. I cannot answer that question, and it is beyond the scope of services we are able to provide." (Ex. 148).

142. Bly wrote an e-mail to Slone on May 25, 2011, saying "I believe that Range has the ability to prevail by concerted sequential efforts which Linda's notice to the Lessor will start on NEXT TUESDAY May 31, 2011. I was most heartened on March 23rd when [two Range VPs] both said they were not going to let this lease expire." (Ex. 160; *see also* Ex. 163, Steinle e-mail May 26, 2011).

143. Although Acree did not remember particular discussions or negotiations about the Lease (Acree Dep. at 24:24-25:7, 27:4-10), he did remember that at the time he signed the Lease, his industry understanding of "commence a well" was "to begin some operation of any kind which would work towards the development of drilling a well on a property," such that a drill bit would not necessarily need to be in the ground by the expiration of the primary term. (*Id.* at 32:4-8, 34:6-19; *see also id.* at 35:14-36:14).

144. In the oil and gas industry, longer periods for "commencing a well" are necessary when there is no pipeline infrastructure and there may not be enough acreage to make a well profitable. (Doc. 61, Tr. Trans. at 19:17-24, 91:2-20, 92:1-5).

145. Doing the background investigatory work could take years, so Range needed that time to determine whether investing in a well was worthwhile. (*Id.* at 13:22-14:6, 18:17-19:9, 21:21-22:3, 28:20-24)

146. As such, signing a completion lease, which would require a well to be complete before the end of the primary term, generally is not prudent. (*Id.* at 14:21-15:16, 17:4-18:8).

147. Range treated the Lease as a commencement lease, as well as the other leases that Bly had negotiated with Great Lakes/Range. (*Id.* at 56:13-19).

148. Steinle was not involved at all with the negotiations or execution of the Lease. (*Id.* at 74:2-9).

## C. Conclusions of Law

1. Good Will engaged AOGA as consultants because Bly held himself out to Good Will to be an expert on oil and gas contracts.

2. Bly and Beyer, as partners of AOGA, had real authority to negotiate the Lease with Great Lakes on behalf of Good Will.

3. Loren Bly acted as Good Will's agent when negotiating the Lease with Great Lakes.

4. In conjunction with Article 1 of the Lease, Article 8.1 establishes that commencing a well within the five-year term of the Lease is sufficient to extend the Lease, so long as Range drills the well with due diligence thereafter.

5. Bly, acting on behalf of Good Will, objectively manifested Good Will's agreement to such contractual language and interpretation.

6.  Benjamin and Acree, acting on behalf of Great Lakes, accepted Bly's proposed lease which included language that permitted extension of the lease by commencing during the primary term and drilling with due diligence thereafter.

7.  The Lease did not terminate on June 6, 2011 because it was extended by Range's commencement of a well within the primary term of the Lease in preparation for actual drilling.

## III. Analysis

Because this is a diversity action alleging state law breach of contract and tort claims, the case is governed by Pennsylvania law. *Nat'l City Mortgage Co. v. Stephen*, 647 F.3d 78, 82 (3d Cir. 2011) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)).

### A. Breach of Contract Claim[3]

In February 2006, Good Will engaged AOGA to negotiate and secure an oil and gas lease with an oil developer. (SOF ¶¶ 2-3). Thereafter, AOGA entered negotiations with Great Lakes[4] on Good Will's behalf. (SOF ¶¶ 5-6). On June 6, 2006, Good Will and Great Lakes entered a five-year oil-and-gas lease agreement ("Lease"). (SOF ¶ 14). Williamson (President) and Hinkleman (Secretary/Treasurer) signed on behalf of Good Will, Acree signed on behalf of

---

[3] To establish a breach of contract claim in Pennsylvania, one must prove: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *McShea v. City of Philadelphia*, 995 A.2d 334, 340 (Pa. 2010). There is no dispute that a contract exists, and if Range did breach, then Good Will clearly suffered damages in the form of continued drilling activity on its property after the Lease expired.

[4] Great Lakes changed its name to Range Resources-Appalachia, LLC in 2007. (SOF ¶ 18).

Great Lakes, and Bly signed on behalf of AOGA. (SOF ¶¶ 15-17). The relevant portions of the

Lease are as follows: Article 1.1 says the Lease

> shall remain in force for an initial term of five (5) years from the date above stated (hereinafter designated "Primary Term"), and shall continue from year to year thereafter for so long as oil and/or gas or other liquid hydrocarbons are produced in Paying Quantities from the Leased Premises or after the development of the First Well in accord with the provisions of Article 8 below, the Lessee is engaged pursuant to Article 9 of this Agreement in a bona fide attempt to secure or restore the production of oil and/or gas or other liquid hydrocarbons by conducting additional drilling operations on the Leased Premises, or Lessee is engaged in the plugging of wells or the removal of equipment there from [sic] pursuant to the Provisions of Article 19 of this Agreement.

(SOF ¶ 91). Section 8.1 is entitled FIRST WELL, and it provides: "[u]nless sooner terminated

as otherwise herein provided, Lessee shall commence a well on the Leased Premises . . .

within five (5) years from [June 6, 2006] and shall drill said well with due diligence." It goes on

to say that "[i]n the event the aforesaid well is not commenced within such five (5)-year period,

this Agreement shall be automatically terminated in its entirety." (SOF ¶ 92).

Good Will claims that the Lease expired in June 2011 without Range meeting any of

the conditions in Article 1 (SOF ¶¶ 58-59), and as such, Range breached the contract and

has trespassed on Good Will's property from then until now. Range claims that in

accordance with Article 8.1, all it had to do was commence operations and thereafter drill

with due diligence. Range further claims that its activities prior to June 2011 constituted

commencement of operations sufficient to extend the Lease.

25

### i. Rules of Contract Interpretation

The sole question for this Court to determine is whose interpretation of the Lease is

correct. "[A] party seeking to terminate a lease bears the burden of proof." *T.W. Phillips*

*Gas and Oil Co. v. Jedlicka*, 42 A.3d 261, 267 (Pa. 2012). Previously, the Court denied the

parties' cross-motions for summary judgment because it found the Lease ambiguous.

(Docs. 31, 32). It then set the case for trial and directed the parties to present parol

evidence of their intentions when they entered the Lease.

> [W]hen a written contract is clear and unequivocal, its meaning must be
> determined by its contents alone. It speaks for itself and a meaning cannot be
> given to it other than that expressed. Where the intention of the parties is clear,
> there is no need to resort to extrinsic aids or evidence. Hence, where language
> is clear and unambiguous, the focus of interpretation is upon the terms of the
> agreement as manifestly expressed, rather than as, perhaps, silently intended.

*Lesko v. Frankford Hosp.–Bucks Cnty.*, 15 A.3d 337, 342 (Pa. 2011) (internal citations omitted).

"When, however, an ambiguity exists, parol evidence is admissible to explain or clarify or

resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language

of the instrument, or latent, created by extrinsic or collateral circumstances." *Ins. Adjustment*

*Bur., Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006). "A contract is ambiguous if it is

reasonably susceptible of different constructions and is capable of being understood in more

than one sense." *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004).

"It is clear also, that every agreement is made and to be construed with due regard to

the known characteristics of the business to which it relates; and hence the language used in a

contract will be construed according to its purport in the particular business, . . ." *Franklin*

26

*Sugar Ref. Co. v. Howell*, 118 A. 109, 110 (Pa. 1922) (internal citations omitted). In construing a contract, the provisions must be construed as a whole and harmonized, if possible, so that all of the terms are given effect. *Contrans, Inc. v. Ryder Truck Rental, Inc.*, 836 F.2d 163, 169 (3d Cir. 1987). "[I]t is well settled that . . . intention must be ascertained from the entire instrument taking into consideration the surrounding circumstances, the situation of the parties *when the contract was made* and the objects they apparently had in view and the nature of the subject matter." *Lower Frederick Twp. v. Clemmer*, 543 A.2d 502, 510 (Pa. 1988) (internal citations omitted) (emphasis added).

### ii. As Good Will's Agent, AOGA's Knowledge Bound Good Will

Bly and Beyer, as partners of AOGA, clearly had real authority to negotiate the Lease with Great Lakes on behalf of Good Will. "It is well settled in the law of this jurisdiction that knowledge of an agent, acting within the scope of his authority, real or apparent, may be imputed to the principal, and therefore, knowledge of the agent is knowledge of the principal." *W.C.A.B. v. Evening Bulletin*, 445 A.2d 1190, 1192 (Pa. 1982); *see also Rosenberry v. Evans*, 48 A.3d 1255, 1262 (Pa. Super. Ct. 2012).

The purposes of Good Will's engagement of AOGA as its consultant were (1) to secure advice from Bly and Beyer on which oil and gas developer to contract with and (2) for AOGA to secure the best terms possible on Good Will's behalf. (*See* SOF ¶ 1). Bly himself defined a "leasing agent" as "a person who has particular understanding of the oil and gas industry who is experienced in the development of leases for the marketing of

acreage or blocks of acreage." (SOF ¶ 93). He testified that he had over thirty years of experience in oil and gas law beginning in 1972 when he "did a large amount of oil and gas law in Jamestown, working with the development of shallow oil wells in northwestern Pennsylvania or Medina gas wells in western New York. And [he] continued to do that up to the present time." (SOF ¶ 88). In connection with these gas wells, Bly performed leasing work on behalf of both landowners and operators. (SOF ¶ 89). Finally, leading up to the execution of the Good Will-Great Lakes Lease, Bly pointed out the lack of legal expertise of other "consultants" in the area.[5] (SOF ¶ 90).

In addition, the members of Good Will had no direct communication with Great Lakes/Range before signing the Lease. (SOF ¶ 11). Hinkleman confirmed at trial that he and other members of the club placed their reliance on Bly to negotiate the lease. (SOF ¶ 94). Williamson admitted that the first time he spoke with anyone about any specific terms of the Lease was sometime in 2010, and that discussion was with DePasqua. (SOF ¶ 95). DePasqua testified that "January 2010" was "the first time [he had] any specific recollection of extension of the lease." (SOF ¶ 96).

DePasqua also testified that he had no conversations with Great Lakes before executing the Lease. (SOF ¶ 97; see also ¶ 11). At Good Will's internal meeting to discuss

---

[5] *E.g.*, "I suspect that this is a DIRECT result of Bill C's awareness of his inability [as a non-attorney] to actually negotiate the terms and provisions of a Lease Agreement as a SUBSTANTIAL CONTRACTUAL LEGAL DOCUMENT . . . .This concern is further supported by Les Greevey's statements to Rob and me on Mar. 10th that he (Les) only will do the TITLE legal review for a client and that he knows his limitations and WILL NOT NEGOTIATE LEASE PROVISIONS as he HAS NO EXPERIENCE IN DOING SO." Also, "This is proof of Mr. C's lack of legal skills. . . . A reading of the text clearly shows that this is done by a non-attorney by lack of proper or precise terminology, syntax or intended legal effect."

whether or not to sign the Lease, Williamson testified he "[did] not believe there was" a discussion regarding how the Lease might be extended. (SOF ¶ 98). He further admitted he never had conversations with anyone from AOGA or Great Lakes "regarding the length of the lease." (SOF ¶ 99). Hinkleman also testified that he "actually" had "no" memory of "any specific discussions that happened at the meeting" and had no understanding of Article 1.1 at the time he signed the Lease. (SOF ¶ 100).

It does not appear that anyone from Good Will asked Bly what "commence a well" meant or how Articles 1 and 8.1 fit together at the time the Lease was drafted and negotiated. (SOF ¶ 101).[6] Bly also stated that he did not recall discussing any specific provisions of the Lease with Good Will representatives "other than the final sit down before signing the lease. And we generally looked at, went through the lease and I kind of said or asked are there any questions. And I believe it was no, let's sign, let's proceed." (SOF ¶ 102).

Thus, regardless of whatever subjective opinions the members of Good Will may have had regarding the conditions under which Range could extend the Lease, their beliefs have no bearing on the Court's interpretation of the Lease because their understanding of the Lease came through Bly.[7] *See Rambo v. Greene*, 906 A.2d 1232, 1236 (Pa. Super. Ct. 2006) ("In ascertaining the intent of the parties to a contract, it is their outward and objective

---

[6] DePasqua did inquire about "the terms with regard to extension of the lease" in an e-mail to Bly and Beyer dated May 30, 2006. (Ex. 26). However, in his inquiry, he referred to Article 7.2(g) of the Lease, not Article 1 or 8.

[7] The Court finds that the members of Good Will who testified at trial were credible, but unfortunately, the Court cannot give any weight to whatever their subjective beliefs were about the interpretations of the Lease.

manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter.") (quoting *Ingrassia Constr. Co. v. Walsh*, 486 A.2d 478, 482-83 (Pa. 1984)). As Good Will's agent, Bly had actual authority to negotiate the Lease with Great Lakes, and *he alone* exercised that authority on behalf of Good Will when negotiating the Lease with Great Lakes. As such, it is *his* understanding of the terms of the Lease that will bind Good Will.[8]

### iii. Bly's Understandings and Intentions

Bly testified that "[t]he primary template and the one that was used with the Good Will property was negotiated with Range Resources' predecessor, Great Lakes Energy Partners, LLC, in 2004-2005 period," before he had formed AOGA with Beyer. (SOF ¶ 103). At the earlier negotiations, Bly had "represented four primary landowners that owned 12,000 acres" and "acted as leasing agent for the four landowners and negotiated the terms of that lease." (SOF ¶ 104). After developing this template, he "submitted it to . . . Brad

---

[8] On cross-examination, Beyer admitted that he was not an expert on oil and gas leases. (Doc. 58, Tr. Trans. at 130:12-14). He further conceded that before 2006, he had no experience with oil and gas leases, other than the experience he had with his own hunting club, Larry's Creek Hunting Club, which had engaged Bly to negotiate its lease sometime in 2003 or 2004. (*Id*. at 130:15-25). Indeed, it was during the Larry's Creek negotiations that Beyer and Bly met and created AOGA. (*Id*. at 131:6-11). With respect to advice Beyer gave to Good Will before December 2010, he stated,

> I may have used the word, drill a well, versus, commence a well, but I think we discussed that they need to either have gas in paying quantities or they need to drill a well. From a laymen's standpoint, you know, it was kind of a fine line in splitting hairs between commencing, drilling and producing gas. It all kind of fell into the same arena, and I never expected it to become an issue of contention.

(Doc. 58, Tr. Trans. at 124:2-10). Until December 2010, Beyer thought that "commencement of a well . . . was synonymous with drill." (*Id*. at 136:16-137:2). However, Beyer also testified that he never gave any legal advice or interpretation of the language of the Lease because he "always did [his] best to make that clear that [he] was not an attorney and wasn't in a position to do that." (*Id*. at 148:1-5). As such, the Court will not address Beyer's understanding of the Lease because he avers to have had none with respect to the issue of what the Lease terms required for extending the period of the Lease.

30

Benjamin and Mark Acree in a joint meeting in Brad's or the little conference room off of Brad's office in Hartville" in "mid '04." (SOF ¶ 106).

Brad Benjamin confirmed that he "did have meetings and conversations with primarily Loren Bly." (SOF ¶ 107). Though Great Lakes had its own standard lease agreement, Benjamin recalled that Bly "had a specific lease for that he wanted to use that . . . he developed. And it was totally different than the lease form that we customarily used." (SOF ¶ 108). Bly's proposed lease was significantly longer than the standard Great Lakes lease and "Bly, as a consultant for his clients, put a lot of additional information and specific provisions and terms within his lease agreement." (SOF ¶ 109). Though Benjamin could not recall specific details about the negotiations with Bly, he was firm in his recollection that Bly "brought the form to us and apparently was working to get the best deal he could for his clients, and this was the form that he wanted to use and insisted upon using." (SOF ¶ 110). Mark Acree, Benjamin's supervisor, corroborated Benjamin's testimony: "Mr. Bly presented a lease form that he had been working on, either with himself or his partner or other people. And that's where we got into that." (SOF ¶ 111).

With respect to Bly's negotiations with Benjamin over the lease in 2003-2004, Bly stated:

[o]ne specific item that I remember was that if you look at . . . the 8.1 paragraph where it says shall commence a well and shall drill the well with due diligence, . . . I know that I specifically asked that that phrase be changed to drill and complete a well with due diligence. And Brad told me that they could not do that and I said why? And he said, because, as you know, after a well is drilled, it is logged. And many times when we don't know a formation

31

or we don't know where you're developing, we have to make a decision not to complete the well. And it made perfect sense to me. So I dropped the requirement of completion of the well as the due diligence of drilling the well.

(SOF ¶ 116). He also said that:

Article 1, I remember a specific meeting and discussion of the interrelationship of Article 1 and Article 8.1, in that I told them that I was wanting to avoid ambiguity in the drafting of that lease. Because the standard oil and gas lease up until that time very often was open ended for the lessee to either to continue the search for oil and gas after the expiration date of the addendum clause or to have to receive notice from the lessor that the lessor deemed the lease to be terminated because the term had passed. And we went to some great length to be very clear that we had solid language in that regard.

(SOF ¶ 117). This form template was what Bly used in his negotiations for Good Will Hunting, as well. (SOF ¶ 118). After creating this form template, Bly initiated contact with Benjamin to discuss potential negotiations between Great Lakes and Good Will. (SOF ¶ 119).

Between the form template and the Good Will-Great Lakes Lease, the only changes Bly specifically remembered making to the template were the bonus provisions and the property description. "We knew that we had to revise the bonus provision and description. And it was primarily a process of getting the . . . basic abstract of the title of the landowner ready for [Range] to review; and I did that." (SOF ¶ 112). As far as any other changes he may have made to the Good Will lease, Bly testified that he did not recall. (SOF ¶ 113).[9]

---

[9] At trial, Range presented evidence that Bly changed another provision of the template. In the original Larry's Creek lease, Article 8.1 provided Great Lakes with twenty (20) months to commence a well, whereas in the Good Will Lease, Article 8.1 provided Great Lakes with five (5) years to commence a well. (*Compare* Tr. Ex. 1 *with* Tr. Ex. 190).

Though Bly had difficulty recalling further specifics of the 2004 negotiations with

Benjamin and Acree, he did remember discussing "[t]he issue of concern to these

landowners was minimizing surface disturbance to their timber lots, to their woodlands, to

their meadows, to their plantings for feed for livestock." (SOF ¶ 114). What was important

to Good Will was protective language for hunting and surface rights. (SOF ¶ 115).

Based on his previous negotiations with Great Lakes/Range, Bly confirmed that

Articles 1.1 and 8.1 must be read together and harmonized to eliminate ambiguity.[10] As

such, Bly admitted that "commenc[ing] a well," whatever the phrase meant, would be

sufficient to extend the lease beyond the primary five-year term. (SOF ¶ 122). Bly also

agreed that the phrase "commence a well" was an industry term of art. (SOF ¶ 124).

"Courts do not assume a contract's language was chosen carelessly, nor do they

assume the parties were ignorant of the meaning of the language employed." *Crawford*

*Cent. Sch. Dist. v. Com.*, 888 A.2d 616, 623 (Pa. 2005).

> In the law of contracts, custom in the industry or usage in the trade is always
> relevant and admissible in construing commercial contracts and does not
> depend on any obvious ambiguity in the words of the contract. If words have
> a special meaning or usage in a particular industry, then members of that
> industry are presumed to use the words in that special way, whatever the
> words mean in common usage and regardless of whether there appears to be
> any ambiguity in the words.

*Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189, 1193 (Pa. 2001); *see also USX*

*Corp. v. Liberty Mut. Ins. Co.*, 444 F.3d 192, 198 (3d Cir. 2006).

---

[10] When asked whether Article 1.1 and Article 8 must be read together to ascertain what actions can
extend the terms of the Lease, Bly stated, "Yes. I think it is in the nature of a specific prescription." (SOF ¶ 121).

33

As a self-designated expert on the oil and gas industry with over thirty years of

experience (SOF ¶¶ 88-90), Bly surely should have known what "commence a well" meant

when he negotiated the Lease with Great Lakes. Therefore, the language in Article 8.1 that

Bly had negotiated previously (wherein he agreed to drop the requirement to "drill *and*

*complete* a well with due diligence" and merely require "drill a well with due diligence")

remained unchanged for the Good Will-Great Lakes Lease. The only changes he made

were to the bonus provisions and description of property, and he inserted protective

language in accordance with Good Will's concerns over minimizing surface disturbance and

hunting rights. In light of these findings, the Court concludes that Bly's actions manifested

an objective intention[11] that Great Lakes/Range could extend the Lease by commencing a

well within the primary term and thereafter drilling with due diligence.

It is also clear that Bly was the principal drafter of the Lease. "Where the language

of the contract is ambiguous, the provision is to be construed against the drafter." *State*

*Farm Fire & Cas. Co. v. PECO*, 54 A.3d 921, 928 (Pa. Super. Ct. 2012). When asked

whether Benjamin ever sent proposed language to Bly, Bly responded,

> [v]ery honestly, it was the other way around. I usually drafted a provision and
> sent it to Brad for his review and approval. One thing in the negotiation
> process that I had learned in my lifetime was that if you can be the author of a
> text you usually have an advantage by drafting it the way you want it, and I
> was please to proceed that way.

---

[11] Whether or not Bly knew what he agreed to and failed to communicate that knowledge to Good Will or
he truly was not aware of what "commence a well" meant (*i.e.*, he committed a unilateral mistake) and only later
discovered his mistake, the end result is the same: Bly agreed to a commencement lease.

34

(SOF ¶ 120). Because all of the testimony agrees that Bly was the drafter of the Lease, any ambiguity, to the extent it exists, should be resolved against Good Will.[12]

### iv. Range's Understandings and Intentions

Mark Acree confirmed Bly's testimony regarding the interpretation of "commence a well." (SOF ¶ 143). Steinle testified that longer periods for "commencing a well" were necessary in the Marcellus Shale because there was no pipeline infrastructure and there might not be enough acreage to make a well profitable. (SOF ¶ 144). Doing the background investigatory work could take years, so Range needed that time to determine whether investing in a well was worthwhile. (SOF ¶ 145). As such, signing a completion lease would not be prudent. (SOF ¶ 146).[13] Although Steinle was not involved at all with the negotiations or execution of the Lease (SOF ¶ 148), the Court finds Steinle credible as to his knowledge of the industry and operations in the Marcellus Shale. Range consistently treated the Lease as a commencement lease, as well as the other leases that Bly had negotiated with Great Lakes/Range. (SOF ¶ 147).

---

[12] Even this assumption is generous given the case law that Range has provided from other jurisdictions and leading treatises on oil and gas law, which indicate that there really is no ambiguity in the Lease and Articles 1.1 and 8.1 can, and must, be read in conjunction. *See, e.g., Humphreys v. Skelly Oil Co.*, 83 F.2d 989 (5th Cir. 1936); *Lester v. Mid-South Oil Co.*, 296 F. 661 (6th Cir. 1924); *Consolidated Gas Co. v. Rieckhoff*, 151 P.2d 588 (Mont. 1944); *Hicks v. Mid-Kansas Oil & Gas Co.*, 76 P.2d 269 (Okla. 1938); 2 SUMMERS, OIL AND GAS § 14:3 (3d ed.); KUNTZ, A TREATISE ON THE LAW OF OIL AND GAS, § 32.3(b). Furthermore, if Bly had intended the lease to be a completion lease, he could easily have inserted express language to reflect that intention. (Steinle testimony, Doc. 61, Tr. at 30:7-23).

[13] "If someone wants to invest $6 million in a well, he couldn't wait ten years to get his money back. If they were to invest hundreds of millions of dollars in developing a field and had no return on that investment for some length of time, it would be ludicrous to think that they could be profitable. They would drill themselves into oblivion." (Steinle testimony, Doc. 61, Tr. Trans. at 17:10-16).

## v. Seemingly Contradictory Evidence

Good Will points to evidence which supports the contrary conclusion the Court has just reached. For instance, Bly sent an e-mail to DePasqua on September 27, 2010 stating "Rob and I still believe that [Range has] realized the need to renegotiate or extend or modify the current lease due to the probable inability to have actual delivered production by the end of the fifth year. They may attempt to do so through a leasing subsidiary." (SOF ¶ 126). Furthermore, in response to the question, "as of September 27, 2010 did you believe that Range had to renegotiate or extend due to the probable inability to have actual delivered production by the end of the fifth year?" Bly responded, "[y]es." (SOF ¶ 127). Bly testified he believed the same as of November 15, 2010 when he told DePasqua "Phil, you've got an HPB lease. It's got to be held by production." (SOF ¶ 128). Later, Bly testified that "I believe that I did refer to it as a paying quantities lease. (SOF ¶ 129).[14]

However, he elaborated that as of September 27, 2010, he "hadn't revisited the subject matter provisions of these termination or exploration at this point in time," so at the time, he believed Range had to be in actual production to hold the Lease. (SOF ¶ 130). He also testified that when DePasqua asked in November 2010 about how the Lease could be extended,

---

[14] Linda Slone, a land manager at Range, wrote to Beyer on November 16, 2010 stating that Range intended to drill on Good Will's land before it expired. "Should anything change in that regard, we would consider lease extensions or renewals." (Ex. 79; *see also* Ex. 97 Slone internal e-mail on March 10, 2011 ("We need to have a drillbit in the ground by expiration."); Ex. 104 Slone internal e-mail on March 29, 2011). However, Slone was not part of the negotiations of the Lease.

this may have been the trigger that caused me to undertake that review, because I had been pressed by [another client] also for a similar answer to the questions of what would hold the lease or what would constitute the commencement of a well. And I believe he used the phrase commencement of a well. And that, you know, brought me back to the lease. And clearly it was there, that was a standard by which development could occur.

(SOF ¶ 131). Thus, when he informed his clients in September and November 2010 that the Lease was a paying quantities or a hold-by-production lease, he had not ascertained whether his statements were correct by first re-reading the Lease.

Bly elaborated, "I understood that to be a provision of the lease, and that I believed it then to be the target as per my discussions with Mr. Steinle of their standard of performance to proceed with what he assured me was a steadfast commitment not to let leases expire." (SOF ¶ 132). Bly rationalized his reference to the Lease as a paying quantities lease by saying "[t]he clear provisions of Article 1.1 are a paying quantities normal provision to hold the lease. It is extended and modified to the extent that Article 8.1 is incorporated as a specific exception for commencement." (SOF ¶ 133). In short, when Bly told DePasqua it was a HBP lease, he admitted "[he] was wrong" (SOF ¶ 134) during his deposition and in his December 2010 letter to Good Will.

### vi. AOGA's Clarification of Interpretation

Upon realizing its mistake, in December 2010, AOGA sent a letter to its clients who had leases with Range in an apparent reversal of position: "we now realize that Range MAY CHOOSE TO commence a well by the end of the stated term and rely upon their ability to hold your lease by their subsequent diligent development of the same." (SOF ¶ 135). Bly

37

explained, "Yes, because it truly was an a-ha moment as we talked with Carl, and as I had concluded about the same time research on Pennsylvania law which led me to see, review, and understand the *Pemco* case." (SOF ¶ 136).

DePasqua forwarded the letter to Williamson, saying "I am less than pleased with the interpretation, but agree that it is probably correct." (SOF ¶ 137). In fact, as early as January 8, 2010, DePasqua wrote to Beyer, "Thanks, Rob. Good catch on the ' . . . or commenc[ing] a well . . .' in addition to the paying quantities provision, *which I did not recall.* I guess the follow-up question will be, what constitutes commencing." (SOF ¶ 138) (emphasis added). DePasqua's response indicates that at some point prior to January 2010, he had been aware of Article 8.1's provision of commencing a well, lending further support for the Court's finding that Good Will agreed that commencing a well during the primary term was sufficient to extend the Lease provided Range drilled with due diligence.

Following up on the letter, DePasqua sent an e-mail to Beyer on April 15, 2011, attaching a copy of the *Pemco* case. Though a non-lawyer, Beyer responded to DePasqua, "[v]ery interesting and a little disturbing. I agree with you that it appears as though there's a broad interpretation of commencement of drilling." (SOF ¶ 139). Perhaps in reliance on DePasqua's April 2011 e-mail, Beyer wrote back to DePasqua on April 18, 2011 saying "Ranger [sic] Resources will most likely prevail in holding your lease unless you are proactive in efforts to delay them." (SOF ¶ 140). Beyer then wrote to John Reynolds saying "[m]ore importantly is the language contained in your current Lease Agreement regarding

Ranges ability to hold your Lease, and how that language would be LEGALLY

INTERPRETED. I cannot answer that question, and it is beyond the scope of services we

are able to provide." (SOF ¶ 141). Bly's own interpretation is reflected in an e-mail he sent

to Slone on May 25, 2011, saying "I believe that Range has the ability to prevail by

concerted sequential efforts which Linda's notice to the Lessor will start on NEXT

TUESDAY May 31, 2011. I was most heartened on March 23rd when [two Range VPs]

both said they were not going to let this lease expire." (SOF ¶ 142).

Despite some evidence that Bly believed the Lease was a hold-by-production Lease,

the Court concludes that at the time Bly negotiated the Lease with Great Lakes/Range, he

agreed to language which allowed Range to extend the Lease by commencing a well within

the primary term and thereafter drilling with due diligence. Whether Bly neglected to inform

Good Will of how Range could extend the Lease, or he simply made a unilateral mistake,

what Bly agreed to was the interpretation that Range has set forth. Thus, the Court finds

that Good Will has not met its burden of proof to show the Lease terminated. See *Jedlicka*,

42 A.3d at 267.

### vii. Range "commenced a well" within the primary term and thereafter drilled with due diligence

Having concluded that commencing a well and thereafter drilling with due diligence

was sufficient to extend the Lease, the Court must now determine whether Range met those

conditions to extend the Lease. The parties have never truly disputed what constitutes

39

commencing a well. *See Pemco Gas, Inc. v. Bernardi*, 5 Pa. D. & C. 3d 85 (Pa. Com. Pl.

Ct. 1977); *Henderson v. Ferrell*, 38 A. 1018 (Pa. 1898).[15]

Bly agreed that "commencing a well" included more activities than having an actual

drill bit in the ground (SOF ¶ 123). At his deposition, Bly opined that Range's activities had

amounted to "commencement of a well."

> Based upon my knowledge of the development of oil and gas wells and the
> new modification of the development of oil and gas wells that occurred by
> reason of horizontal drilling and hydrofracking, I am very sure that the
> activities of Range before the termination of the lease constituted the
> commencement of a well.

(SOF ¶ 125). The Court agrees with Bly and Range and finds that Range took several

actions before the Lease expired in June 2011 to constitute commencing a well, including

staking a drill site, obtaining several permits and easements, clearing timber, constructing

roads to the Well site, and beginning construction of the pad site. (SOF ¶¶ 20-29, 33-39,

41-49, 52-57). *See Pemco*, 5 Pa. D. & C. 3d at 91-96. Thereafter, Range took steps to drill

the Well and completed the Well in March 2012. (SOF ¶¶ 61, 63-84).

Understandably, Good Will was frustrated by the lack of clarity in the advice it

received from AOGA. Carl Steinle, Land Manager of the Northern Marcellus Shale Division

for Defendant, may have put it best:

> I think a lot of the misconceptions that come up are expectations that are
> generated amongst [landowners] that are unrealistic. I think maybe even
> unrealistic as to the advisors. Remember, the advisor had taken one lease,

---

[15] Good Will attempts to distinguish the cited Pennsylvania cases by saying the Court should treat deep oil wells different from shallow oil wells, which were at issue in *Pemco*. (Pl. Post-Trial Brief, Doc. 65, at 29-30). However, Good Will points to no authority in support of making legal distinctions between the two types of wells.

before he advised as a lease consultant, he consulted on this lease, one of the advisors. That's one lease experience he had. The people that were involved in this were very inexperienced, and they created their own doubts and questions that were not correct, and there was no one amongst them, including, perhaps, their counsel, to set them straight, at the time.

(Doc. 61, Tr. Trans. at 85:4-14).[16]

## IV. Conclusion

In conclusion, the Court finds that the Lease was a commencement lease, and Defendant took sufficient action to commence a well within the original five-year term of the lease. Thereafter, Defendant drilled the well with due diligence, such that it extended the Lease by its actions.

As such, the Court finds in favor of Range on Good Will's claims for declaratory relief, ejectment, and trespass and will enter judgment in favor of Range and against Good Will on these claims. The Court further finds in favor of Range on Range's counterclaim for declaratory relief and will enter judgment in favor of Range and against Good Will on Range's counterclaim.

Robert D. Mariani
United States District Judge

---

[16] Steinle further testified, "I think [Bly] took clauses from leases, almost like a Chinese menu, he selected what he wanted to put into the lease to make it work, and I think it became a little awkward as to how the lease functions. But it does function; it's just awkward." (*Id.* at 34:3-6).